Good morning. Tracy Dressner and Jay Lickman for the petitioner Jesse Zapien. Our plan today is to divide the argument into three parts. I'll be doing about a five-minute procedural introduction. Then Mr. Lickman will be addressing substantively and factually the issues that were the subject of the evidentiary hearing. And then I'll come back and discuss the jury misconduct claim and answer any questions regarding any of the other issues. Very well. So this case is an outlier in California death penalty, in how California death penalty cases are litigated. Federal habeas law, especially in the years since the ADPA, is premised on the understanding that the State courts should be the principal forum for litigating habeas challenges. And Federal habeas law, even under the ADPA, contemplates that a capital petitioner will receive at least one full and fair hearing on his claims. And although California, unlike many other States, rarely holds hearings outside on their State habeas petitions, this case still falls outside of the general practice for litigating capital cases in California. And so Mr. Zapien never had a full and fair hearing until he was in his 15th year of litigating in Federal court. And because of legal changes that took place after the evidentiary hearing concluded and Mr. Zapien's case was already on appeal and pending briefing in this court, we're in a situation where this Court can't consider the information that was developed and prepared for the Federal evidentiary hearing unless Mr. Zapien can show that he satisfied either 2254 D.I. or D.II. based solely on the State court record. The chronology I'm about to explain shows why Mr. Zapien met the D.II. standard, that the State court adjudication resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court hearing because of an inadequate State court fact-finding process. So we're talking about a crime that occurred 30 years ago in 1984. And in 1987, not long after Mr. Zapien was convicted, he was appointed counsel by the California Supreme Court. And at that time, they had a dual appointment system, so your attorney that was appointed on your direct appeal also did your State habeas. And also at that time, there was no presumptively timely due date for a State habeas petition. Mr. Zapien has his direct appeal. He loses his direct appeal. There's a certiorari petition filed in the United States Supreme Court, and Mr. Zapien's attorney died while that cert petition was pending. And no State habeas petition had ever been filed on his behalf. Nothing happens. The California Supreme Court doesn't appoint new counsel for Mr. Zapien. Instead, in 1994, Mr. Zapien goes to Federal court where Mr. Lichtman and another attorney are appointed to represent him. This is in 1994. Counsel then requests funds to investigate in Federal habeas claims, and the court denies that request and tells them, except for some money for a law clerk, and tells them, I'm not giving you any money until you go out and talk to the trial attorney about how we conducted the case. Kind of an odd proposition when you haven't done any investigation, but they do that. Then they file a motion for reconsideration of that funding motion, and again, the court says no money. Now you have to submit trial counsel's declaration about why he did whatever he did that we don't know yet because you haven't done your investigation. So they do that. Then in 1995, they file a supplemental funding request looking for things including mental health mitigation investigators and whatnot. And the court finally grants them some money. They give them $12,325, of which $1,875, less than $2,000, was for mitigation investigation, and that was for a pair of legal-to-gather documents. Because of your limited time, I'm trying to figure out how the procedure here is relevant. I mean, it seems like you've got some other issues. I'm getting right there. Okay. That was all of the money that Mr. Zapien ever received from Federal court or State court to do a Federal habeas investigation in this case, slightly over $12,000, of which under $2,000 was for mitigation. He then – and that's critical for two reasons. At that time, the California Supreme Court was allowing $12,000 for habeas investigations. Mr. Zapien never received that $12,000 from California Supreme Court. When his attorneys filed their State habeas, they filed a request for funds from the State court, explained that there had never been any money received because of the death of the attorney, and it was denied. At that time, in the early 1990s, the Federal courts were routinely funding habeas investigations when the Petitioners got to Federal court. And they were funding it even if the Petitioners already had State habeas petitions, which most of them did. This is an outlier case that came into Federal court without a State habeas. How does that affect the destruction of the tape? I mean, it seems like she would be talking about the destruction of the tape, the hand, whether or not that was a possibility, maybe the juror. I'm happy to discuss those, but we have this big we have this situation where we have this Federal evidentiary hearing that puts out a wealth of information about a penalty case presentation that should have been presented at Mr. Zapien's trial. Counsel, can we consider the information that was developed at the Federal evidentiary hearing? Under pinholster, you cannot unless you make a D-1 or D-2 determination. And I'm explaining why we the funding of the fact-finding procedure in State court for the State court habeas was so inadequate in this case that we meet D-2. There was no an unreasonable determination of the facts because there was no way to establish the facts because this case was such an outlier in the way the cases were being conducted in the early 1990s. We have the situation where most most every other habeas petitioner at that time in California was getting tens of thousands of dollars to do investigation. And where do you address this in your brief book pages that I know of? It's addressed in page 97 of the opening brief in footnote 34. The, the. 97 footnote 34? Yes. So if that's the most important part of your argument, you put it in a footnote? It's not the most important part of our argument. It's important. You now spent 7, 8 minutes and haven't gotten any of the substantive issues. It is. It goes to the D-2 finding so that this Court can, so that this. Footnote 34 has no citation of authority. It's best I can tell it's a historical recitation. Which is what I. Where, where, where is it that you make this argument about? It's in the part that we're footnoting. We explained in there that Mr. Zapien never received funding to do a Federal habeas investigation until 15 years after. Where do you talk about inadequate fact-finding on that basis? I'm sorry? Where in the brief do you talk about inadequate fact-finding because of the lack of investigation? In that section, in that section that that footnote addresses, there's a section about, I think it's standards, standards or law related to. Your claim is not enough investigation money, and that is a failure in the fact-finding process, and you're saying it's here in the brief. Yes. And as a result, Mr. Zapien never received a hearing in State court. And that's here in this section somewhere.  So counsel, if we disagree with you that that issue has been adequately raised, do you concede that under the findings before, under the record before the Federal hearing, you don't have enough to establish? No, absolutely not. And in fact, Mr. Zapien is going to address that. And I think at this point I'm going to step aside and let Mr. Zapien address the actual issues, the substantive law and facts related to that claim. You mean your Mr. Lichtman? I'm sorry, Mr. Lichtman. Good morning. I'm Jay Lichtman. May it please the Court. Let me ask, see if I can answer the question. Under, after Pinholster, as Ms. Ressner said, you can't consider evidence in the Federal hearing except if you show D-1 or D-2. Our position is that both D-1 and D-2 are, have been fulfilled. Ms. Ressner. Are you continuing the argument? I'm trying to answer the question. No, I was going to go into something substantive. I think the question was where in your brief do you raise the inadequacy in investigatory funds as a, as a basis for finding inadequacy of the State court finding? Next thing I want to hear is a page number on your brief, or I don't know, or it's not there. I don't want an explanation. Where in your brief is it? I think the reference to the funds is the reference that she made, but it's in the context of the D-2. In the footnote on page. The footnote, yes. But it's in the context of the D-2.  We're now a third of the way through your argument time. So we'll look at this and either find that it is preserved or it's not preserved. Okay. So do you want to go on? Yes, I do. Okay. What I want to say is D-2 was satisfied because a prime offensive case was presented in the State habeas petition, and there was no State habeas evidentiary hearing. And under Taylor, Nunez, and Hurley, Hurley's, that's a, a finding of D-2 because you, you have an, an, an inadequate fact-finding process. And D-1 is satisfied because when you consider the mitigating evidence presented at the State trial versus the more compelling mitigating evidence in the State. I'm sorry. This is all because of inadequate investigatory. No, Your Honor. I'm talking now. Let's put that aside, if I might. I'm talking now about the showing the State habeas petition, why, why you can consider the Federal evidence despite pinholster. And you can, as Your Honor knows, in your district court opinion in Williams, you have a, a tollbooth analysis where you have two roads, D-1 and D-2. If you pass through the tollbooth on either one, you're in Federal court. And, and that's what we have here. But you were in Federal court. No, no. You don't have to make that argument. No, no. You're in Federal court, but you can consider the Federal evidence despite pinholster because of D-1 and D-2, and, and, and D-1 because our position is under Richter no fair-minded jurist would fail to acknowledge the prima facie case and find a reasonable probability of a different outcome had the mitigation evidence been, been presented. So let me now turn to the more subtle. So is, is, is that exactly what pinholster, what pinholster's own claim was? And remember what happened to pinholster. Well, pinholster, as, as the Court is very well aware, is. Very well. Yes, because I think it's. But, but no, I'm not, I'm not trying to compare this case to pinholster. What I'm saying is that is a straight pinholster claim. That is the very claim that pinholster made and lost on, right? Yes, because the facts. And you, you, you think your client's case is more compelling than pinholster's. Oh, absolutely. But pinholster, as you know, because the Supreme Court cited your dissent, I think, at least three times, pinholster was totally different. You had a, a client, a defendant who testified in the gill phase, sort of the courts had glorified his criminal disposition. He bragged about committing hundreds of robberies. He was a white supremacist who would carve swastikas on people's property. And his own doctor, Dr. Stolbart, said he was a psychopath. That was in the gill phase part. So they didn't use Dr. Stolbart. In the penalty phase, the aggravating evidence was, was compelling. He threatened to kill the lead witness. He uh. We know pinholster. Okay. So our case is. Why don't you talk about your case? Okay. Our case is, is much different. It has been long has been the, the standard in the Federal courts that in a penalty phase, that for that lawyer, it is imperative. I'm quoting Carroll. It is imperative that all relevant mitigating evidence be unearthed. And what that means under the case law is, number one, the lawyer is to prepare social history. So he finds out about the background and family history of his own client. So he can start to build a case for sympathy or to humanize his client. And number two, what a lawyer would do, competent lawyer, where indicated he would have his client a mental health evaluation. What did, what did the lawyer here do, not do that you think he should have? The lawyer didn't do a social history investigation by his own admission at the evidentiary hearing. You hired an anthropologist to look at the history here. Yeah. An anthropologist who never interviewed Zapian and never viewed a social history. So her testimony was not personalized. It was in general about the poverty of La Colonia. But she was easily impeached by the, by the DA because she didn't know nothing about Zapian. And that's the same thing he did with Dr. Hainer about heroin, who didn't interview Zapian, didn't interview a social history. When did the trial take place here? Sorry? When did the trial take place? When did the trial? Yeah. 1986 to 87. And were social histories being done then? I believe absolutely they were done. In fact, if you, as we cited in the brief, the 1980 ABA standards talk, which applied and the Supreme Court has indicated ABA standards are, are germane. They talk about doing a background investigation of your client. I mean, cases like Eddings and Woodson that were in the Supreme Court before that, they talked, they, they talked about the importance of mitigating evidence to develop in these cases. So when, when your client has some indications of potential mental disease, which in this case was the case, because his family, Zapian's family, had a, was a multigeneral, multigenerational history of, of mental problems. For example, his mother died of a brain stem tumor. His brother tried to commit suicide, was referred for psychiatric treatment. Zapian himself had blackouts. So a lawyer knowing that, you would then have your client, a mental health evaluation done of your client. But it was never done here. So to answer the Court's question. And what's, and what's your best authority in terms of when a social, was there a case out there because the social history wasn't done and presented that that was error? That it was required? Yes. That it was error. We, well, there's, there's a number of cases we cite in the briefs about. What's your best one? If, if you're talking about a more recent case, there was, there was Ryan. I believe Ryan, if I have the, James v. Ryan on page 62. I'm sorry, what case? Page 62, James v. Ryan. You're talking about from your brief? Yes. I'm sorry. The opening brief? That's, that's one example there are, there are. And so let's play this out. I mean, I'll look at James v. Ryan again. But what would have happened with the social history? What would have been presented and would have made a difference? Because there, you know, hard to dispute that the, Mr. Zapian didn't have a lot of issues with respect to his family. I mean, his sister and the relationship between his sister and his father and what ended up happening between his sister and his father, it's all very disturbing. But I'm not quite sure, you know, how that would have helped him if the lawyer had presented all of that. I mean, it's a fair argument that the jury would have viewed that. I mean, it's a double-edged sword. But the jury would have viewed that, that, oh, well, he came from such a violent and troubled background, and that's why he's so violent and troubled. Well, as the, as courts have said, you have to assess in their, in their term the moral culpability of a defendant. And sure, you, sometimes you could look at bad evidence, like in Penholster, which is really bad evidence. But generally, you need, a jury needs to know for sympathy to humanize the client. I mean, that's. But it doesn't always sympathize the client, does it? And I'm just asking these questions because you're raising these very fair points. Your Honor, nothing is always. It depends. But it's a question of what a competent lawyer would have done at the time. And he certainly would have done a social history investigation. Well, what a competent lawyer would have done and whether he had a, you know, strategic possible reason for not doing it, right? Well, in reality, he testified at the Federal evidentiary hearing and admitted he was IAC. Right. So he didn't have a reason for it. He didn't do it because. We can't look at what happened at the Federal evidentiary. Well, I think you can because we have complied with D-1 and D-2. A prima facie case was presented in the State habeas petition with no hearing in State court. That's D-2 and D-1 is satisfied as well. So, yes, indeed, our position strongly is that you can consider the Federal evidence. But, you know, in large part, the evidence that was presented in Federal court was presented in the State habeas petition. The main difference is we finally got money to hire the experts. So we had experts who testified at the Federal hearing. There was no money to hire them for the State hearing. But the same claims, the same four main claims were raised in the State habeas petition and were raised in the Federal petition and litigated, when I say four main deficiencies of trial counsel in the penalty phase. And that was the four same issues were presented in the Federal hearing as well. So to try and pick up on your question, Your Honor, what happened at this case in the penalty phase in terms of social history, the lawyer, because he never prepared a social history and never had his client evaluated, he presented one witness who, I think it was the mother of Zabian, a friend of Zabian's mother, who said that the mother was a single working mother. And another witness said Zabian had drug problems. Now, when you compare that type of mitigation to what could have been presented, his father had abandoned the family when Zabian was age 5, then conducted a 13-year incestuous relationship with his sister before he killed her and killed himself. The mother was not out working. She was out prostituting or acting as a coyote or allowing the men she was with to impregnate two of her daughters. But you say, because there's a lot of evidence, and the State court made a determination, and we have to determine whether that was unreasonable. You're saying that we should say that it was unreasonable. Absolutely. And then there was the hearing before the Federal district court. And the Federal district court, though, I know you want us to look at the facts before the Federal district court. How about the conclusion of the Federal district court? I think in all due respect, the Federal district court was wrong. Because his determination was that it was trial counsel's was also not unreasonable. The Federal district court had various explanations trying to justify the position of the State. And actually, the district court remarked a few times that it may seem that I'm really in favoring the State, and when the State lawyer would examine witnesses, the district judge would correct the lawyer and tell him what he's doing doesn't help his case. I don't find a district court judge being particularly neutral when he seems to side with one side. But putting that aside, I think when you look at his explanations, he's not basing it on evidence. He's basing it, for example, he said that he knows what a Santa Maria jury would do because he used to bicycle in that area. Well, those are extra record facts that are no part of the – shouldn't be no part of this hearing. He tried to give explanations. I think the Supreme Court has this term, post hoc rationalizations for facts that – in other words, to try and explain away a clear error that existed. So I think that district court is wrong in this case. I think you have to look at it de novo, and you look at the type of mitigating evidence. I mean, this guy, Mr. Zapien – I'm not exactly sure. What is it that you've presented that counsel should have seen was available for him to see that he didn't see? What indication? There's no indication that your client is – has mental problems. There was nothing in the record. That he had mental problems? Yeah. The lawyer knew that his mother had died of a brain stem tumor, that his brother? So what? Well – What do you have in the record saying that all these things are hereditary, tumors are? No. That's exactly why you do –  Do you have something in the record that says tumors are hereditary? I mean, the fact that – When you have a mother dying of that, when you have a brother who tried to commit suicide – No, I'm sorry. Let's talk about the mother. I mean, you have a mother that dies of a brain tumor. So what? Okay. Well, it is that – What do you have in the record that suggests that having a parent with a brain tumor suggests that he will have some sort of brain problem? Well, that's not the only fact. Okay. But you mentioned that as a fact. So I thought we would discuss it. And see whether it has any bearing at all. Well – If you – And then we can move on to the next fact. So you mentioned the mother's brain tumor. Okay. What do you have in the record to suggest that the mother having a brain tumor has any effect on the son? Because the brain tumor was connected to neurological problems that we talked about in the state habeas. I'm sorry. What do you have in the record that connects the mother's brain tumor to any possible or likely brain defect in the son? Your Honor, when you have a mother who has neurological problems – Do you understand the question of what do you have in the record? The answer to a question that starts what do you have in the record is it's on page X of the excerpt or it is the affidavit of Dr. Y or something like that. So let me say it one more time. What do you have in the record that suggests that the mother's brain tumor has an effect on the son's mental health? I'm not saying it has an effect on the son's mental health. It is an indication. It is an indication of the son's mental health. No, that it may be. That it may be an indication. What do you have in the record that suggests that? The fact it was connected to neurological problems. No. What do you have in the record? Do you have an affidavit? Do you have an expert report that says if the mother has a brain tumor, that's more likely to cause the son to have some mental illness? I believe, and I don't have it at my fingertips. Okay. So let's move on to the next fact. Okay. So you said something about the brother. Okay. The brother attempted suicide and was referred for psychiatric evaluation. Okay. So what do you have in the record that says that if the brother has attempted suicide and has possible, was referred to for mental examination, that that makes it more likely or that indicates there's some mental health problem on the part of petitioner? What do you have in the record to support that? I think it's a fact that a lawyer would consider in deciding whether to have. I know you think that, but the fact that you think that doesn't help me any. It doesn't help your client any. I mean, you can think a lot of things. Lawyers think many things, but you're not a psychologist. You're not a psychiatrist. You're not an expert. And I, in fact, don't have any idea in the real world whether the fact that one, you know, I know lots of people who've had relatives who've attempted suicide, and they're perfectly fine. But I'm a layman. I don't have any knowledge. So if you want to say, look, the lawyer should have known because of X. Now, in, if I get my facts of the case right, a pinholster, he actually had been in the hospital. He had actually had a brain injury when he was a kid. So there was indication. So there was a record. He had an expert that said, look, there's white matter in the brain. So what do you have in this case? What is it that would have led a lawyer in 1986 looking at Mr. Zapien to have said, wow, this guy is likely to have had mental problems. I should have him examined. Okay. In addition to those two factors about his family, Zapien himself had head injuries. He had blackouts. He was suspected of maybe having syphilis, which could have affected his brain function. And these are factors certainly that would give the lawyer some indication. Look, have your client evaluated. I mean, there's things about the client that present a possibility that he has mental problems. Have him evaluated. What is the – I mean, you're talking about defending a capital case. So have him looked at by a doctor and have him analyzed to see whether there's a mental deficiency. And had he done that? But didn't he – I guess it was during the trial, or I'm seeing something at SER 725-31. It looks like defense counsel did receive a mental health evaluation of the Petitioner but decided not to introduce it. Trial counsel's prior public defender who left the case had the client evaluated by a Dr. Ratner. Now, that's known – what Dr. Ratner did was known in the forensic community as a drive-by. He essentially did a one-hour or less evaluation. He wrote a five- or six-sentence social history. And he created – and he had no background on the defendant. And so even Mr. Davis, the trial lawyer, said he would never consider the Ratner declaration or report because it was of no value. And Dr. Jackman said the same thing. So – Because you had said he never had him evaluated, but it looks like there was an evaluation and he decided not to use it. That's what – I wouldn't – yeah, I wouldn't call that an evaluation. He had him seen briefly in a – in a brief one-hour sort of very quick review. You have about a minute and a half. If you want to save an air bottle, I think you'd better sit down. All right. Thank you, Your Honor. We'll hear from State. Good morning, Your Honors. Deputy Attorney General Joseph Lee on behalf of Respondent. Here, the California Supreme Court reasonably rejected Petitioner's claims of ineffective assistance of counsel at the penalty phase. And first of all, all of the ineffective assistance of counsel claims were summarily denied by the California Supreme Court on habeas corpus. And therefore, the question under 2254d under Richter is whether there is any reasonable argument supporting the State court's denial of relief. And here, it was reasonable for the California Supreme Court to deny the claim based on the evidence that it had before it. As noted in our brief, the analysis under Section 2254d is limited to the record that was before the State court that adjudicated the claim on the merits. And therefore, none of the later ---- Counsel for Mr. Zakin spent a considerable amount of time talking about the lack of funding. If you could just respond to that, please, and how that may have affected the ability for development of evidence at the State, which therefore, I guess, may affect the ability to look at this under D-2. Yes, Your Honor. First of all, I don't believe that claim was adequately raised in the briefing in Federal court. I don't recall seeing anywhere the novel claim that the ---- that inadequate funding equals inadequate fact-finding under D-2. Okay. First of all. But continuing on, when a claim is presented on habeas corpus in State court, California law requires that the allegations be stated fully and with particularity and that they are supported by reasonably available documentary evidence. And a California habeas court will not accept conclusory or hearsay allegations. Now, here on State habeas, although Petitioner had trial counsel's declaration, which was executed in May of 1995, he did not present it to the State court in support of his habeas petition, which was filed over a year later. In fact, the first time it was offered to any court was in 2001 in Federal court in an opposition to our motion for summary judgment. Therefore, in State court, Petitioner chose not to provide reasonably available documentary evidence, and because of that failure, there was no way for the court to determine whether or not counsel had tactical decisions for his acts or omissions. And therefore, the California Supreme Court could have reasonably rejected Petitioner's claims of ineffective assistance of counsel based on this failure alone. But ---- Sotomayor, can we talk about a couple of things I wanted to ask you about? One about the medical report in the hand. Wasn't the lawyer clearly deficient in not raising the medical impossibility based on the report that he had from the doctor that to commit this kind of crime, because apparently he would have had to use a gun and a knife in the murder of the victim here. And I guess there's a ---- it's a pretty compelling medical record, shows that his hand was severely fractured. What's your response to that? Well, first of all, once again, in State court, there was no declaration from trial counsel showing that he was aware of or had received this report from the doctor. And although there's a declaration from the doctor, there's nothing from the doctor saying that he provided this to trial counsel. But ---- and beyond that, Petitioner himself provided no evidence to the State court that either before or during trial, he made trial counsel aware that he had a prior hand injury. And this is something, if he did have a prior hand injury and if it was impossible for him to stab and shoot Ruby Gonzalez, this is certainly something that he would have told his trial counsel, hey, I couldn't have ---- Where did that medical record come out, then? When would ---- where does that medical record come out, not until Federal court? No. The declaration was presented on State habeas. But as I said, there's no indication that Petitioner ever made trial counsel aware that he, in fact, had a broken hand. And therefore, trial counsel wouldn't have been obligated to search for medical records pertaining to broken bones on behalf of Petitioner, absent Petitioner having informed him that I couldn't have done this murder. There's some indication of a cast. It's so ambiguous. What exactly is that? I mean, if he had a cast, the lawyer presumably would have seen it. I think he was apprehended quite soon after the murder, if I remember the sequence of events correctly. He was not apprehended. He fled after ---- he fled immediately after the murder. And there were witnesses who saw him immediately. Right. He fled. He went to the Christian home. But I thought it was a matter of days. Was it more than a few days? I believe it was more than a few days, because he fled to Madera and then later to Phoenix, Arizona. However, there were witnesses who testified immediately prior to the murder and immediately after the murder, and none of them testified that Petitioner was wore a cast or that his right hand was swollen and incapacitated. Were they asked those questions? They were not asked those questions. But presumably, first of all, since one of the witnesses was his sister, Inez Blanco, who testified that the day of the ---- the day before the murder, Petitioner was ---- came into her car and was searching under the floor mats for change, that she would have noted that he could have only ---- he only used one hand to search for the change because he had a cast on his right hand. But even assuming that to be ---- even assuming that to be correct, the doctor did not testify that it was impossible for Petitioner to use his right hand. And of course, he still had a fully functioning left hand. And in addition, the victim in this case was both stabbed and shot. He didn't say impossible, but he described it as pretty, you know, difficult. It would have been very difficult. He said it would have been difficult, but not impossible. Assuming he had the cast on and assuming he just ---- he did not have the cast on, he said it would be very painful, but never said that this is something that he wouldn't be able to do. And especially in light of the fact that ---- Any reason to think he couldn't have done it with his left hand? Excuse me? Any reason he couldn't have done it with ---- any reason in the record that he couldn't have done it with his left hand? No, Your Honor. That's what I stated. He had a fully functioning left hand. I mean, there's not stab wounds or anything that come from a particular direction that suggests a right-handed. No. In fact, some of the ---- I'm sorry to interrupt, but ---- Do we even know if the Petitioner is left-handed or right-handed as far as the record is concerned? I'm not certain, but I believe he is right-handed. But in any event, the wounds were all close contact wounds made within a short distance. And I believe that the records indicate that some of the wounds were made to the victim's right side, which could tend to indicate that the person stabbed with the left hand or shot with the left hand. Let's talk about the tape. Yes, Your Honor. It just seems remarkable what's happened, you know, with respect to consequences. We have clear bad faith. And the Supreme Court, in its opinions when reviewing the destruction of evidence ---- and I know it's been exculpatory in nature, but they have made a specific point, I think it was in Youngblood, to highlight how you look at whether or not there was bad faith. There was clearly bad faith here. What's your response? I don't believe there was bad faith in ---- There wasn't bad faith when the detective knew that there's an envelope from the defense counsel with the tape in it, and instead of giving it or going through the appropriate channels of giving it back to the counsel, he destroys it? Well, at the time he threw it away, he wasn't considering that he was depriving the defendant of any sort of evidence. And as ---- How would he know? Unless he looked into the envelope, how would he know whether or not he was depriving the defense of evidence? Well, he didn't know. And he didn't even know if the tape pertained to this case. So why not just give it to the person who was identified as having left it instead of making the decision to discard it? Surely that would have been a better decision on his part. Well, I'm glad to hear you think so. Because apparently the DA, there's some question about, you know, what the DA, you know, said and did. I guess the detective got credited. I'm not sure that the DA did here. So there's a dispute between the detective and the DA in terms of what was said. That's correct. And the trial court had to resolve that conflict in the testimony and resolved it in favor of the detective, who testified that although the prosecutor had told him to go and listen to this tape and report back his findings, the detective decided that he didn't want to be placed in that unethical position, and therefore he threw it away, which was surely improper. But he did it so as to treat the tape as it had never been found. Well, but the thing about it is that implies some knowledge that there may have been something of value on the tape. I don't think it necessarily does. I think as I stated, he just, as he testified, he just didn't want to be placed in a position where he knew he was doing something improper, unethical, by listening to the tape. And therefore, as he testified, he wanted to treat it as if it had never been found, so he threw it away with the rest of the stuff, the rest of the trash that had been in the car, the county car that they had drove in. So why don't we extend, you know, Trombetta and Youngblood to include evidence that's not, that's just not exculpatory, but that's important to the case? I mean, otherwise, there's no consequence for prosecutors destroying potential evidence. Well, Your Honor, there is no Supreme Court authority. I know. I just asked, I mean, because, well, I mean, you can argue that Youngblood and Trombetta, I know it deals with exculpatory, but why don't we expand that? I just, how's there not going to be any consequence at all for these, for this conduct? I mean, you put the best varnish that you can on it with respect to the detective, you know, just throwing away an envelope, but it seems pretty clear from a review of the evidence, I mean, of all the record here, that they had a pretty good idea that there was something in that tape, I mean, in that envelope of value. They wouldn't have been so conflicted and had so much discussion about it if they didn't. So what do we do? We just ignore it? I guess the DA got demoted and is getting paid just half his salary, and that's it. I mean, what kind of message does that send to prosecutors? Well, first of all, Your Honor, the trial court reasonably found that the tape was not listened to. And second of all, there was a transcript of the tape that had been preserved by the defense. So the prosecution gained nothing from the destruction of the tape, and the defense lost nothing. And therefore, it was reasonable for the California Supreme Court to conclude that Petitioner wasn't harmed and that his rights to due process weren't violated. But on the issue of whether the prosecution was sanctioned or punished, the defense sought and received a pre-instruction to the jury regarding the prosecutorial misconduct in this case. And therefore, prior to opening statements, the trial court advised the jury that VanCamp had been removed from the case for prosecutorial misconduct and that the District Attorney, Tom Sneddon, would be personally prosecuting the case. The defense was then allowed to question members of the jury individually as to what, if anything, they may have heard about the trial, what they interpreted the trial court's instruction or the term, quote, misconduct to mean, and whether they could still be fair and impartial in light of the instruction. And finally, even though the misconduct did not relate to Petitioner's guilt or innocence and a finding was made that the tape had not been listened to, the defense was allowed to introduce evidence of the tape incident in mitigation at the penalty phase on the issue of the question of whether it was proper for the jury to sentence Petitioner to death in light of the fact that the prosecution had committed misconduct. And to that end, the defense was allowed to call Detective Harry Height, the person who had thrown the tape away, to testify. So in other words, at the penalty phase, the jury was made fully aware of the exact nature of the misconduct and was allowed to assess that evidence in deciding whether or not the death penalty should be imposed. So I believe the prosecution was punished, was sanctioned here. And so the answer is we don't have anything. According to you, there's nothing else that needs to be done or should be done about the prosecutorial misconduct that took place here. Well, the prosecutorial misconduct did not work to deprive the defendant, to render Petitioner's trial fundamentally unfair. And that is because it wasn't the tape wasn't listened to, the defense still had a transcript of the tape, and therefore, as I stated earlier, the prosecution gained nothing from it, the defense lost nothing from it. And the defense was given the opportunity at trial to demonstrate that the prosecution of the case reflected an awareness of the contents of the tape. It should be noted that as of October 31st, the date that District Attorney Sneddon assumed control over the case, he turned over to the defense all of the investigative notes pertaining to the case, dating back to, I believe it was either October 1st or October 4th, which was the date the tape was discovered. And therefore, the defense had in its possession these notes and could surmise based on the notes or the strategy or any reinterviewing of witnesses whether the prosecution reflected an awareness of the contents of this, of the tape. And they were allowed to come back and make a showing at trial as to this. They never did. In State court, on direct appeal, they were entitled to do that as well. They did not. In Federal court, on Federal habeas, they were entitled to do that as well. They have not. All they have relied on here is just pure speculation that the tape was listened to, and that is not sufficient to overcome the factual finding. And that there's no evidence of the tape to show anything else. I mean, the problem, we don't know that it wasn't listened to other than the trial court's finding, which I understand that we probably have to accept at this point. But if the tape had existed, if it wasn't thrown away, there would have been a way to find out whether or not it had been listened to. There would have been a way to find out that it had been listened to. But in order to determine that the prosecution, that the defense was prejudiced by it, and that the prosecution had used it to their advantage, as I stated, the defense was allowed to show that. The investigative notes were turned over. The defense was allowed to demonstrate that the prosecution of the case demonstrated some sort of awareness of the contents of the tape. And that is really the only way to show that the tape had been listened to. What about the external contact by the juror? It looks like one of the jurors heard a report specifically about Mr. Zapien that he would have assaulted a guard or an officer at the detention facility. Is that? That he had made threats against the guards if he were to be given the death penalty. That's it. That's exactly it. I know there was a whole process which the judge undertook in questioning appropriately to see if that juror could be fair and impartial. But what I have some question about and some pause about, in response to that questioning, the juror at one point says, well, when I think it was in response to the defense counsel's question of whether or not something would come up where the jurors were talking about, you know, Mr. Zapien and his conduct, what happened in light of this juror's knowledge? And he says, well, I guess I'll have to take a passive role. And so clearly that might affect his ability to deliberate. What's your response to that? Because the judge kept him on. Well, as the California Supreme Court found, read in context, that juror's comments simply indicated that he would be careful not to reveal the information to the other jurors. And here what we had was jurors ---- Well, but he did say, I would have to take a passive role. Did he not? I mean, I'm getting that quote correctly. Yes. Okay. That is correct. But made in the context of the hearing, the remarks indicated simply that he would be careful not to reveal that information to other jurors. And taken as a whole, since he had already agreed to disregard the information, based his verdict solely on the evidence, and said that he could still be fair and impartial, the juror's response supported the State court's finding that no prejudice resulted. And in here, once again, Petitioner is just relying on sheer speculation. But he had alternates. Why wouldn't he have just pulled the alternate at that point? Well, I think just in light of the fact that the juror came to the trial court and notified him at the earliest opportunity, and then that there was a hearing held at which he said he could still be fair and impartial and would disregard the information, I mean, that is sufficient to dispel the presumption of prejudice and for the trial court to determine that this juror could still be fair and impartial. Petitioner, as I said, Petitioner is just ---- So we have to make a determination of whether or not the State court's decision to keep that juror on was reasonable, is that correct? I mean, the State court's decision saying it was not, it was okay for the trial court to keep him on was not unreasonable. This ---- I think it's more the State court's finding that the presumption of ---- presumption of prejudice had been rebutted was reasonable. Let's say ---- Because there was ---- because the receipt of that information was misconduct. And so the issue was whether it was rebutted. And I'm sorry to interrupt. Let's say it wasn't an issue of misconduct. Let's say on the first day of deliberation, a juror passes a note to the judge saying, I have laryngitis. I can't talk. And presumably if you can't talk, you can't participate in deliberations very well. And again, I realize it's slightly different, but not that different. And the judge says, well, that's okay. You know, there's no misconduct. I mean, there's no issue of taint, so there's no hearing necessary because there's nothing to have a hearing on. It's just that you now have a juror who can't perform one of the essential functions of deliberations, which is to talk. I guess jurors don't have to talk in deliberations, but you presume they should be capable of talking if they want to. So a juror discloses that. Or, you know, I have, yeah, I mean, I can't talk. And the state court said that's okay. Would that be the kind of thing that we could just let go? I mean, it sounded to me like what's going on here is a juror says I'm not going to participate in deliberations. I'm going to listen but not talk. I don't think that's what he – that's read in context, as I stated. I don't think that's what he said. And as to the juror who said he couldn't. What exactly did he say? I thought he said I'd be passive. He said he would – he would – let's see. Obviously, I'm not going to disclose that I have that information. I can't refute if someone were to make that charge. I would not be able to stand up and strongly refute it and say I have some other information. So I would simply have to play a passive role if something like that ever came up. That's all I can tell you, and that has concerned me, is that what – So you're reading that as saying I would have to play a passive role if that issue came up, not I would have to play a passive role as to everything. Correct. As to that specific issue. I see. And the issue actually is future – Do you agree it would be a tougher case if he had said in that case I'm not going to say anything to a deliberation, so I don't let it slip out? Of course. Certainly, Your Honor. Okay. But the remarks were made in the context of future dangerousness, and to the extent that the juror was passive on the subject of future dangerousness, that, I think, would go to Petitioner's benefit, if anything. Because he only had bad things to say about him. Correct, Your Honor. Correct, Your Honor. Okay. Thank you. Thank you, Your Honor. You have a minute and a half for rebuttal. You may take it. I'm going to go backwards. With respect to the juror misconduct, it's particularly relevant because Mr. Zapien put on evidence of good behavior. And so that would be a likely topic to come up in penalty-phase deliberations. The issue for this Court is whether the California Supreme Court's narrow view of what he said was accurate, and it's not. He was very clear that he was concerned about what role he could take if the issue of future dangerousness came up. But we must defer. The question is not whether we would make the same finding on the same evidence. The question is whether the findings of the State court is unreasonable. It was the record does not support the California Supreme Court's factual finding that all he said was that he wouldn't address if somebody said something about future dangerousness. He said, I would take a passive role if that issue comes up. Mr. Zapien was entitled to the deliberation of 12 jurors deliberating his death, not 11. Not 11. And he said he would take a passive role and he was concerned about it. He said he wanted to be fair to Mr. Zapien. That's why he said he even brought it up. With the issue regarding the tape, there's the only, to me, reasonable possibility that the tape was thrown away was to hide that the tape was listened to. And there's no – and so to say that all of the things that Respondent said, said that the tape was thrown away. Again, we'd have to disregard the findings of the State court, right? We'd have to say they're unreasonable. Yes. And this evidence is unreasonable. Given the circumstances of the way the tape was thrown and the way he claimed he threw it away, it just makes – it's unbelievable. It's unbelievable that he would have done that without knowing. Unbelievable is different from unreasonable. The question is, unbelievable is whether we would believe it. Unreasonable is saying no rational jurist would believe it. And I can't believe any rational jurist who would look at what happened and his explanation for throwing that tape away, I don't believe any rational jurist would have believed that he had thrown that away without knowing it had exculpatory value. And the only reason you would not have turned that tape back over is to hide what you had done with that tape. And this critical part is for that three and a half weeks between the time the tape was found and the time that Mr. Zapian's attorney found out, that prosecutor who had committed misconduct was out there reinterviewing the very witnesses that were discussed in the tape. Thank you. Thank you. The case is arguable. It stands submitted. We are adjourned.
judges: Kozinski, Rawlinson, Murguia